FILED
01/25/2022
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 30, 2021 Session

**IN RE DA'MONI J. ET AL.**

**Appeal from the Juvenile Court for Knox County**
**No. 186481   Timothy E. Irwin, Judge**

_____

**No. E2021-00477-COA-R3-PT**

_____

This appeal arises from the termination of a mother's parental rights to her minor children upon the juvenile court's finding the statutory grounds of abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody of and financial responsibility for the children.  The juvenile court further found that termination of the mother's parental rights was in the children's best interest.  We vacate the statutory ground of persistent conditions because we are unable to verify that this finding was the independent judgment of the juvenile court.  We affirm the remaining grounds for the termination of the mother's parental rights, as well as the juvenile court's determination that termination of the mother's parental rights was in the children's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KRISTI M. DAVIS, JJ., joined.

Anna East Corcoran, Knoxville, Tennessee, for the appellant, Atiya L.

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

## OPINION

## <u>Background</u>

Da'Moni J. and Di'Amir J. ("the Children") were born in 2015 and 2017 respectively to Atiya L. ("Mother") and Michael J. ("Father"). Mother testified that she first became involved with the Tennessee Department of Children's Services ("DCS") when she was asleep in the home and the Children were found walking around in the parking lot outside the home. At that time, DCS assisted Mother in putting door alarms and door locks on the home. In October 2018, Mother's electricity had been cut off after she failed to pay her bill, and the DCS case manager offered to pay the bill. Mother testified that she declined DCS's offer to pay her bill and the electricity was off only for approximately a day. According to Mother, she had lost her job because she did not have a vehicle and had no money to ride the bus. Subsequently, Mother and the Children were about to be evicted from their home after damage to the apartment that she stated was caused by the Children. A DCS child protective services case manager went to the home and found the Children left alone in the apartment. According to Mother, the Children were asleep when she left and Mother had been in a building across the street talking to an associate about a job opportunity. At the time, the Children were ages three and one-and-a-half.

DCS initially filed a petition with Knox County Juvenile Court ("the Juvenile Court") on November 2, 2018, alleging that the Children were dependent and neglected and requesting that the Children be placed into the custody of the maternal grandmother. On the same day, the Juvenile Court entered an *ex parte* order, placing the Children into the temporary legal custody of the maternal grandmother, pending a preliminary hearing. Less than a week later, the Juvenile Court entered a bench order, placing the Children into the custody of DCS on November 6, 2018, "upon the report of harm by a CPS Investigator and the oral motion of the attorney for the Tennessee Department of Children's Services requesting that the above styled children be placed in the foster care." In its bench order, the Juvenile Court found that probable cause existed to believe the Children were dependent and neglected because the Children had been found by the CPS Investigator to be left alone in the home. The bench order found that DCS had made reasonable efforts to prevent removal of the Children from the home.

At the adjudicatory hearing, the parents stipulated that the Children were dependent and neglected "due to the mother's failure to provide appropriate care and supervision as evidenced by the mother leaving them alone in the home and the father's incarceration throughout the case." The Juvenile Court ordered that the parents would be allowed supervised visitation with the Children, with DCS having the authority to eliminate the supervision requirement at their discretion.

Mother signed a copy of the "Criteria & Procedures for Termination of Parental Rights" in November 2018. DCS developed a family permanency plan regarding the Children on November 26, 2018, which was ratified by the Juvenile Court in January 2019. Mother participated in the development of the permanency plan and was in agreement with the plan, as evidenced by the Juvenile Court's order. In its order, the Juvenile Court found that the responsibilities in the permanency plan were reasonable, related to remedying the reasons the Children were in foster care, and in the Children's best interest. According to the Juvenile Court's termination order, those responsibilities were "designed to fix those problems by helping [Mother] develop parenting abilities." This permanency plan listed several responsibilities for Mother, including requiring Mother to (1) complete a mental health assessment and follow all recommendations therefrom; (2) complete an alcohol and drug assessment and follow all recommendations therefrom; (3) provide DCS with documentation to show completion of any recommended services from the assessments; (4) comply with and pass random drug screens; (5) obtain and maintain an appropriate home; (6) obtain and maintain a legal source of income to adequately support the family and provide proof thereof or provide proof of efforts to obtain income; (7) visit with the Children; (8) refrain from operating a motor vehicle without a driver's license; (9) complete parenting classes; (10) demonstrate learned parenting skills necessary to parent the Children during visits; (11) refrain from leaving the Children alone at home for any period of time; (12) be a law-abiding citizen and refrain from incurring new criminal charges; (13) comply with all court orders; (14) cooperate with DCS and all service providers; (15) sign releases to allow direct contact between DCS and providers; (16) refrain from associating with known drug users; and (17) pay child support. The June 2020 permanency plan reflected that Mother had complied with the mental health requirements of the permanency plan, had completed parenting education classes, had stated to DCS that she had been employed but provided no documentation for several of her statements, had no vehicle for transportation, had been provided several bus passes, and was currently utilizing public transportation.

Three subsequent revised permanency plans were developed in June 2019, January 2020, and June 2020, and all three plans included essentially the same responsibilities as the initial permanency plan. Those permanency plans each were approved by the Juvenile Court, with the Court finding that the responsibilities in the plans were reasonable, related to remedying the reasons the Children were in foster care, and in the Children's best interest.

In January 2020, Mother was arrested for vandalizing a car. She pled guilty in November 2020 to misdemeanor vandalism. During trial, Mother acknowledged that she had pled guilty to vandalism and stated: "I ain't worried about that. My kids was getting abused in their home." The affidavit of complaint identifies Jordan L., who is apparently a sister of Ramone L., as the victim and states that Mother had punctured all four tires on the vehicle, destroying them. It states that she also "scratched and scribbled deep the word

- 3 -

'bitch'" onto the side of the vehicle and placed long scratches "all around in several areas," which had destroyed the paint on the vehicle.

On October 1, 2020, DCS filed a petition to terminate Mother's and Father's parental rights to the Child.[1] DCS filed a motion for default judgment or to conduct a scheduling conference. The Juvenile Court subsequently entered a continuance order, scheduling a trial date. The continuance order stated that Mother had filed an answer to the petition prior to the default judgment hearing and requested appointment of counsel; however, that answer does not appear to be included in the record.

The Juvenile Court conducted a trial in April 2021. On that date, the Juvenile Court first addressed the maternal grandmother's pending petition for custody of the Children, heard testimony as relevant to the pending petition, and ultimately denied the maternal grandmother's petition for custody. The Juvenile Court then proceeded to address the petition to terminate Mother's parental rights to the Children, in which the following witnesses testified: (1) Mother; (2) Michael Cohan, a licensed private investigator hired by DCS; (3) Mark Akers, director of Child Help foster care programs in Tennessee; (4) Walter Ramirez, a representative of Child Help; (5) Father; and (6) Stasi Friedrich, the DCS family services worker for the Children.

During trial, Mother testified that she made a mistake when she left the Children unattended but "nobody is perfect." According to Mother, she was just asking a few questions and planned to come back to the house. Mother testified that she had consistently visited with the Children and had a strong bond with them. According to Mother, when she was late for visits, she was coming from work and had to ride the bus. She further testified that she had participated in play therapy with Da'Moni. Mother stated that she loves the Children. Mother acknowledged that she had not paid child support during the four months prior to the petition's filing but stated that she had been laid off from her job due to the Covid-19 pandemic.

Mother initially denied knowing anyone named Ramone L. After admitting to knowing Ramone L., Mother denied being in a romantic relationship with Ramone L. and stated he was a friend. According to the records admitted at trial, Ramone L. is a man who was charged in December 2020 with aggravated assault after Mother was struck with a bullet from what police believed to be a .380 caliber gun. Mother described it as "a whole misunderstanding." According to Mother, she was walking and a bullet bounced on her leg and Ramone L. and two other individuals had helped her. Ramone L. ultimately pled guilty to assault in January 2021, although Mother denied that she had a tumultuous relationship with him.

---

[1] Although the termination proceedings involved both Mother's and Father's parental rights, only Mother has appealed the termination of her parental rights.

Mother stated that Ramone L. was last at her home in March 2021 to bring some of her money back to her. However, Michael Cohan testified that he observed a man outside at Mother's residence on two occasions in April 2021, who he believed to be Ramone L. Prior to arriving at Mother's home, Mr. Cohan had obtained information about a vehicle jointly owned by Mother and Ramone L. Mr. Cohan testified that while outside Mother's home, he had observed a vehicle consistent with the vehicle's description on multiple occasions, observed Mother driving the vehicle, and saw Ramone L. working on the vehicle. Mother stated that she and Ramone had shared a car at one point when they were "around each other" but that she did not currently have a car. Although Mother testified that she and Ramone L. were not living together, Ms. Friedrich spoke to Mother's landlord and the landlord confirmed to her that Mother and her boyfriend, Ramone L., were still living in the apartment.

Regarding the allegations that Mother had not put the youngest child in a proper car seat during an unsupervised visit, Mother explained that if you tell ETHRA Transportation that a child has an appointment, they will provide a car seat; however, they had not provided a car seat for the youngest child and she did not have access to her car seat at the time. Mother said she felt like it would count against her if she did not show up so she placed the child in a seat with a seat belt. Mother and the child were going to the DCS office at that time.

Mother testified that she had completed therapy, an intensive outpatient program, and her mental health assessment by February 2020. According to Mother, she had to complete another alcohol and drug assessment because she had failed a drug screen for THC. Mother stated that she completed a new alcohol and drug assessment and it had recommended that she complete intensive outpatient treatment. She testified that she completed the treatment requested and had provided a certificate to DCS.

Additionally, Mother's attorney referred to a new mental health assessment and a new parenting assessment that Mother had completed in late 2020. Mother did not recall the recommendations from the recent parenting assessment. Moreover, Mother testified that she did not recall any recommendations from the new mental health assessment. However, Mother testified that DCS paid for her to receive mental health treatment at Health Connect and that she had last spoken with that provider in December 2020. Mother acknowledged that there was a six-month period right before the petition was filed when she had no therapy. Mother testified that she was currently in therapy through Cherokee Health and that she had attended her second appointment recently. She said it took so long because of Covid-19 and lack of availability at a lot of places. However, Ms. Friedrich testified that when she reached out to the service provider with whom Mother reported working, they informed her that Mother was not in their system. They stated that Mother had never been seen for any services at Cherokee Health Systems.

- 5 -

Mother stated that at the time of trial, she had been working for approximately six months and that she had been at her current job at a hotel for two weeks. Mother testified that she did not have personal transportation but gets around with Uber or a bus. Mother acknowledged that she had recently been to court because she was being evicted. According to Mother, she was getting evicted because of complaints about her and "apparently [she] committed fraud" because she had filled out her housing application for Knoxville's Community Development Corporation in 2017 when she had custody of her oldest son and had not changed it.

Mark Akers, the director of Child Help foster care programs in Tennessee, testified that he was the Children's case manager for the first year and a half they were in foster care. According to Mr. Akers, he attended several of the visits between Mother and the Children and opined that the Children's behavior during the visits was "all over the place," with them sometimes being attentive and sometimes dysregulated. Mr. Akers further testified that after the visits with the biological parents and sometimes during the visits, the Children had struggled "quite a bit, especially the older child, just with his emotions and his behavior, just dysregulated, a lot of anxiety for both boys, and especially the older." He testified that at times Mother would display good parenting skills but at other times, Mother would feed into the Children's behaviors and would "almost be more of a peer than a parent." He stated that he believed it was sometimes confusing for the Children. According to Mr. Akers, Mother's behaviors would sometimes cause the Children's behaviors to escalate and during the time he was assigned to the case, Mother's parenting skills with the Children had not improved. He stated that he would have concerns with the supervision and general safety of the Children if they were returned to Mother's custody.

Walter Ramirez, also an employee of Child Help, testified about his observation of the Children during visits with Mother. He testified that he had concerns with Mother's behavior with the Children during the visits and observed inconsistencies in her behavior that caused him to question her parenting ability. He explained that Mother would be fine at first but then become more childlike, which he opined "really dysregulates the children" and was concerning about her parenting ability. He recounted an incident at Mother's visit where Mother had the Children hop onto her back and they were hitting the walls of the room. One of the Children yanked off her wig. Mother was also throwing balls at the Children's faces. Mr. Ramirez explained that the Children had struggled with aggression and the visit had gotten "a little bit out of hand." He stated that they tried to de-escalate the situation, but the Children had not calmed down.

Mr. Ramirez testified that he had observed calmer behaviors from the Children in the foster home but that he had not seen a change in their behaviors at the visits during the five months he had been assigned to their case. According to Mr. Ramirez, there was a bond between Mother and the Children but the level of bond was questionable due to the nature of the interactions between them. According to Mr. Ramirez, he does not believe the Children see her as a mother. He testified that in the foster home, the Children had a

"calm way about them" and were more regulated with their emotions. He opined that the Children also have an attachment to the foster parents.

At the conclusion of the hearing, the Juvenile Court announced its ruling, wherein it found that DCS had proven the following statutory grounds for the termination of Mother's parental rights: (1) abandonment by failure to provide a suitable home for the Children, (2) substantial noncompliance with the permanency plans, and (3) failure to manifest an ability and willingness to parent the Children. The Juvenile Court made several findings of fact relevant to each statutory ground analyzed in its oral ruling. DCS had pled the statutory ground of abandonment by failure to support, but the Juvenile Court found that Mother had successfully proven that her failure to pay child support was not willful. The Juvenile Court did not address the statutory ground of persistent conditions in its oral ruling. Additionally, the Juvenile Court found that termination of Mother's parental rights was in the Children's best interest. In its oral ruling, the Juvenile Court appears to consider the new best interest factors that went into effect in April 2021. After DCS's counsel inquired, the Juvenile Court stated: "The new best interest factors incorporate all nine of the old best interest factors. I think my findings would work either way, they would be identical."

The Juvenile Court subsequently entered a detailed written order with a summary of the testimony presented, its findings of fact, and its conclusions of law. The Juvenile Court included in its judgment an extensive summary of the testimony presented, findings of fact, and conclusions of law. The Juvenile Court found that the witnesses, Michael Cohan, Mark Akers, Walter Ramirez, Father, and Ms. Friedrich, were credible but that Mother was not credible. In its written judgment, the Juvenile Court found the following grounds for the termination of Mother's parental rights: (1) abandonment by failure to provide a suitable home for the Children, (2) persistent conditions, (3) substantial noncompliance with the permanency plans, and (4) failure to manifest an ability and willingness to parent the Children. Regarding the grounds for termination of Mother's parental rights, the Juvenile Court found as follows in pertinent part:[2]

### 3. ABANDONMENT - FAILURE TO PROVIDE A SUITABLE HOME
### T.C.A. §§ 36-1-113(g)(1) and 36-1-10[2](1)(A)

In this case, pursuant to Tenn. Code Ann. §§36-1-113(g)(1) and 36-1-10[2](1)(A), the Court finds by clear and convincing evidence that [Mother] has abandoned the children for failure to provide a suitable home. . . .

---

[2] Because we have vacated the ground of persistent conditions, we have not included it in our recitation of the Juvenile Court's findings of fact and conclusions of law.

The children were removed from [Mother's] physical and legal custody by a court order at the beginning stage of the proceedings in which a petition has been filed in juvenile court alleging that [the] children are dependent and neglected children, and the children were placed with the Department of Children's Services. The Department of Children's Services made reasonable efforts prior to the children's removal. For a period of four (4) months following the physical removal, the Department made reasonable efforts to assist the mother to establish a suitable home for the children, but [Mother] has not made reciprocal reasonable efforts to provide a suitable home and has demonstrated a lack of concern for the children to such a degree that it appears unlikely that [Mother] will be able to provide a suitable home for the children at an early date. The efforts of the Department to assist [Mother] in establishing a suitable home for the children shall be found to be reasonable and such efforts exceed the efforts of [Mother] toward the same goal, and [Mother] was aware that the children were in the custody of the Department.

The Juvenile Court adjudicated the children dependent and neglected and placed them in DCS custody, pursuant to a petition filed in Juvenile Court, after they were removed from mother's home, legal, and physical custody on November 6, 2018 and found to be dependent and neglected on January 17, 2019 within the care of the parents. The Juvenile Court's Bench Order that removed the children found that the Department made reasonable efforts to prevent removal. The Department attempted to assist the mother to prevent the removal which did not resolve the issues. The children were left unattended on at least two occasions, one incident occurred after the Department provided the mother with door and window locks. Further, the Department assisted the mother to maintain her apartment however she was about to be evicted at the time the children were removed from her care.

That during the relevant four month period of May 1, 2020 through August 31, 2020, the Department of Children's Services assisted the mother to provide a suitable home for the children, to wit: preforming [sic] random drug screens (including a hair follicle screen); offering visitation; paying for and scheduling a second alcohol and drug assessment (due to positive drug screens); and providing PCIT.

During the relevant four-month period of May 1, 2020 through August 31, 2020 which followed the physical removal of the children from the home but are more recent in time, [Mother] has not made efforts to provide a suitable home. Instead, [Mother] has been dishonest to KCDC by telling them the children live with her, she failed to pay her rent, and engaged in behavior which resulted in complaints with the apartment complex all of the

- 8 -

aforementioned have caused her to be in an eviction process; has been late to visits, has failed to appropriately engage with the children during visits; tested positive for THC; lied to DCS about sharing her home with a violent criminal who pled guilty to shooting the mother; and transported Da'Moni without a car seat. The mother has not addressed any of the issues which brought the children into the care of the Department: she is about to be evicted from her second apartment, the previous apartment where she resided with children at the time of removal was located at ***; the mother has not been able to pay her KUB bill; she continues to be engaged in violent relationships with men; [Mother] has been dishonest with the Department and is currently dishonest, during sworn witness testimony, to the Court; she still has a substance abuse issue; the mother does not exhibit safe and appropriate parenting skills; she has not actively participated in therapy; and recently the mother pled guilty to aggressive criminal activities. The mother is in no better position now to care for the children then when the children were removed from her custody in November of 2018.

Once again, [Mother's] failure to make even minimal efforts to improve her home and personal condition demonstrates a lack of concern for the children to such a degree that it appears unlikely that she will be able to provide a suitable home for the children at an early date. Further, the efforts of the Department to assist the mother in establishing a suitable home for the children were reasonable, in that they are equal to, or exceed, the efforts of the mother towards establishing a suitable home.

DCS has proven, by clear and convincing evidence, the ground of abandonment for failure to provide a suitable home against [Mother].

### 4. SUBSTANTIAL NONCOMPLIANCE WITH PERMANENCY PLAN
### T.C.A. §§ 36-1-113(g)(2) and 37-2-403(a)(2)

In this case, pursuant to Tenn. Code Ann. §§36-1-113(g)(2) and 37-2-403(a)(2), the Court finds that there is clear and convincing evidence that [Mother and Father have] not complied with the tasks on the permanency plans and are in substantial noncompliance with the permanency plans.

After the children came into state custody, the Department of Children's Services created permanency plans for them. The initial permanency plan was prepared on November 26, 2018 and listed a number of requirements that [Mother and Father] needed to satisfy before the children could safely be returned home. The plans gave [Mother and Father] until May 26, 2019 to satisfy those requirements.

The initial plan required [Mother] to complete parenting; cooperate with DCS, the GAL, and the Court; address mental health needs; address substance abuse issues; obtain and maintain residential stability; obtain and maintain financial stability; visit the children; and obtain and maintain reliable transportation. [Mother] signed the plans on November 26, 2018.

* * *

The Juvenile Court ratified the initial permanency plans on January 17, 2019 as in the children's best interests and found that the requirements for [Mother and Father] were reasonably related to remedying the reasons for foster care.

The responsibilities for [Mother and Father] are reasonably related to remedying the reasons for foster care. The adjudicatory order placed the children in foster care due the inability of the parents to provide for the appropriate care and supervision of the children as evidenced by the mother leaving the very young children unattended and the father's incarceration throughout the history of the case. The responsibilities are designed to fix those problems by helping [Mother and Father] develop parenting abilities.

The permanency plan was revised on June 5, 2019. The revised plan reiterated the requirements in the initial plan. The revised plan gave [Mother and Father] until December 5, 2019 to satisfy the requirements. [Mother] signed the revised plan on June 5, 2019. . . . In addition, the Juvenile Court ratified the revised permanency plan on August 19, 2019 as in the children's best interests and found that the requirements for [Mother and Father] were reasonably related to remedying the reasons for foster care.

The permanency plan was again revised on January 6, 2020. The revised plan reiterated the requirements of the first two plans. The revised plan gave [Mother and Father] until July 6, 2020 to satisfy the requirements. [Mother] signed the revised plan on January 6, 2020. . . .

The permanency plan was revised on June 3, 2020. The revised plan reiterated the requirements of the prior three plans. The revised plan gave [Mother and Father] until December 3, 2020 to satisfy the requirements. [Mother and Father] signed the June 3, 2020 plan. Further, the Juvenile Court ratified the fourth permanency plan on June 18, 2020 and found that the requirements for [Mother and Father] were reasonably related to remedying the reasons for foster care.

[Mother] has not substantially complied with the responsibilities and requirements set out for her in the permanency plans. [Mother] has not stopped abusing drugs; secured suitable housing; or evidenced learned parenting skills. The mother completed some assessment but did show proof that she followed up with the recommendations. Further, she continues to maintain a relationship with an individual who pled guilty to shooting her and has be[en] continuously dishonest regarding said relationship. In addition, the mother is about to be evicted and has only been employed for two weeks.

* * *

The Department of Children's Services made reasonable efforts to help [Mother] to satisfy the requirements in the permanency plan by providing bus passes; providing a resource guide; scheduling a mental health and alcohol and drug assessment and assisting with the recommendations from same; preforming [sic] random drug screens (including a hair follicle screen); paying for and scheduling another alcohol and drug assessments (the second assessment was necessary due to mother having positive drug screens); providing parenting class information; providing therapeutic visitation; and PCIT. . . . Additionally, the Department provided the following on behalf of [Mother and Father]: services to support the children's basic needs for health, education and the necessities of life, including food, clothing and shelter, a nurturing foster care placement that provided love and affection for the children which is necessary for normal childhood development, and ongoing case management to monitor the safety of the children and address their medical and dental needs.

The Department provided the terms of the permanency plans and the plan requirements were reasonable and related to remedying the conditions that caused the children to be removed from [Mother's and Father's] custody in the first place. [Mother's and Father's] noncompliance was substantial in light of the degree of noncompliance and the importance of the particular requirements that were not met by [Mother and Father]. The requirements of the permanency plans were intended to address the problems that led to removal; they were meant to place the parents in a position to provide the children with a safe, stable home and consistent appropriate care. [Mother and Father] did not put in any real effort to complete the requirements of the plans in a meaningful way in order to place themselves in a position to take responsibility for the children.

The Department has diligently attempted to assist the parents in completing the permanency plan requirements. The Department of

- 11 -

Children's Services made reasonable efforts to assist the parents in satisfying the requirements as stated in the permanency plan, yet [Mother and Father] did [not] utilize the copious amount of services offered to them. They did not avail themselves of the services to resolve the issues which brought the children into the care of the Department.

The Court finds that, as of the date of hearing, the permanency plans prepared by the Department and ratified by the Juvenile Court are reasonable and related to remedying the reasons for which the children was placed into foster care, such that, had [Mother and Father] cooperated with the same, it would have addressed the reasons for which the children were in DCS custody and would have resolved the issues that kept the children from returning home. [Mother and Father] are not in substantial compliance with the permanency plans.

DCS has proven, by clear and convincing evidence, the ground of substantial noncompliance with the permanency plans against [Mother and Father].

* * *

## 6. FAILURE TO MANIFEST AN ABILITY AND WILLINGNESS TO ASSUME CUSTODY
### T.C.A. § 36-1-113(g)(14)

In this case, pursuant to Tenn. Code Ann. § 36-1-113(g)(14), the Court finds that there is clear and convincing evidence that [Mother and Father] have failed to manifest an ability or willingness to assume custody of the children.

[Mother and Father] failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the children. Placing the children in the legal and physical custody of [Mother or Father] would pose a risk of substantial harm to the physical or psychological welfare of the children. [Mother] lives with the man who shot her with a .38 caliber hand gun as shown by witness testimony, she does not acknowledge that her relationship with [Ramone L.] is tumultuous, she does not know how to safely parent the children, she has not attended therapy in six months, she continues to abuse illegal substances, and the mother is about to be evicted from her residence which is the same situation as when the children came into the care of the Department. . . .

- 12 -

[Mother and Father] were aware that their children were placed in the care of the Department. Since that time, [Mother and Father] have failed to show any ability or willingness to care for their children. [Mother and Father] have done nothing to show that they have the ability or willingness to care for the children. [Mother's and Father's] actions have shown a complete lack of interest and concern regarding their children's welfare.

In addition, [Mother and Father] have not complied with the requirements as set forth in the permanency plan. [Mother and Father] did not complete the tasks on the permanency plans and said requirements were established to resolve the issues that brought the minor children into the care of the Department. [Mother] has not shown that she can safely care for or supervise the children. Due to the substantial unresolved issues of domestic violence, substance abuse, inability to safely parent and housing, if the children were returned to the legal and physical custody of [Mother and Father], it would pose a risk of substantial harm to the physical and psychological welfare of the minor children.

DCS has proven, by clear and convincing evidence, the ground for termination for failure to manifest an ability and willingness to assume custody against [Mother and Father].

In its written judgment, the Juvenile Court appears to address a combination of the best interest factors in effect at the time the petition was filed and the new factors that had recently been enacted prior to trial. Concerning the best interest analysis, the Juvenile Court found as follows in its written order:

### 7. BEST INTEREST
### T.C.A. § 36-1-113(i)

Under Tenn. Code Ann. §36-1-113(i)(1), the Court is required to find that termination of parental rights is in the children's best interest.

In this case, the Court finds that there is clear and convincing evidence that termination of [Mother's and Father's] parental rights is in the best interest of the children.

After having found that grounds exist to terminate the parental rights of [Mother and Father], the Court analyzed whether or not it is in the children's best interest for termination to be granted and the Court considered all relevant and child-centered factors applicable to the minor children's case. In addition, when considering the following factors, the Court considered the prompt and permanent placement of the children in a safe environment as

- 13 -

presumed to be in the children's best interest. The nonexclusive list of best interest factors, which are found in T.C.A. § 36-1-113(i)(1), are supported by the facts of this case and weigh in favor of terminating [Mother's and Father's] parental rights. Further, the Court reviewed the best interest factors as pled and amended according to T.C.A. § 36-1-113(i)(1)(A)-(T). The combined best interest factors clearly indicate that termination of [Mother's and Father's] parental rights is in the best interest of the minor children. In coming to that determination, the Court considered the following:

1. It is in the best interest of the minor children for termination to be granted as to [Mother and Father], because they have not made changes in their conduct or circumstances that would make it safe for the children to go home. [Mother and Father] have made no effort to remedy the conditions that prevent placement with them, and it is not in the children's best interest to be with the parents. [Mother and Father] have not complied with the requirements of the permanency plan or resolved the issues that brought the children into the care of the Department.

2. It is in the best interest of the minor children for termination to be granted as to [Mother and Father] because they have failed to effect a lasting adjustment after reasonable efforts by the Department for such a duration of time that lasting adjustment does not reasonably appear possible. The children have been in the care of the Department since November 6, 2018, and the same issues exist for the parents as when the children came into custody.

* * *

4. It is in the children's best interest for termination to be granted as to [Mother and Father] because there is not a meaningful parent/children relationship between the parents and the children. . . . The mother has not shown a meaningful parent child relationship due to her inability to parent and lack of regard concerning her parenting skills.

5. It is in the children's best interest for termination to be granted as to [Mother and Father] because changing caregivers at this stage of the children's lives would have a detrimental effect on them. The children are placed in a loving home, being well cared for, and having their needs met. The foster parents wish to adopt the minor children. [Mother and Father] have failed to change any of their behaviors or put the needs of the children above their own desires. The foster parents have provided a safe and stable home for the minor children and they are thriving. If Da'Moni and Di'Amir

- 14 -

were removed from placement, this would have an extreme detrimental effect both psychologically and physically on the minor children.

6. It is in the best interest of the minor children for termination to be granted as to [Mother and Father] due to the effect that a termination of parental rights will have on the children's critical need for stability and continuity of placement throughout the children's minority. The children did not have stability until they were placed in the care of the Department, and the foster parents wish to continue to provide them with stability and continuity.

7. It is in the best interest of the minor children for termination to be granted as to [Mother and Father] since changing caretakers and physical environment is likely to have a negative effect on the children's emotional, psychological and medical condition. The minor children entered [foster care] after being left unattended by the mother. The children have been in the care of the Department for approximately two and a half years, and the mother still has not shown an ability to safely provide for the care and supervision of the minor children. The foster parents have continuously provided for the children's physical, emotional, medical and psychological needs, changing caretakers would have an extreme negative effect on the children.

8. It in the best interest of the minor children for termination to be granted as to [Mother and Father] since the parents have not demonstrated continuity and stability in meeting the children's basic material, educational, housing, and safety needs. The mother is about to be evicted, lives with a dangerous criminal, and abuses illegal substances. . . .

9. It is in the best interest of the minor children for termination to be granted as to [Mother and Father] since there is no secure and healthy parental attachment between the parents and the children and there is no reasonable expectation that the parents can create such attachment. . . . During visitation sessions, the minor children and the mother have shown that they do not have a healthy parental attachment.

10. It is in the best interest of the minor children for termination to be granted as to [Mother and Father] because the parent has not maintained regular visitation or other contact with the children and has not used the visitation or other contact to cultivate a positive relationship with the children. . . . [Mother] has not cultivated a positive relationship with the children and has shown that she is incapable of forming such a relationship with the children.

11. It is in the best interest of the minor children for termination to be granted as to [Mother and Father] since the minor children have created a healthy parental attachment with another person or persons in absence of the parent. The minor children are bonded with the foster parents and they are placed together in the foster home. The children have lived with the foster parents since April of 2019. The foster parents have provided for all their physical and emotional needs including giving love and affection.

12. It is in the best interest of the minor children for termination to be granted as to [Mother and Father] because the children have emotionally significant relationships with persons other than parents and caregivers, including biological siblings, and the likely impact of various available outcomes on these relationships and the children's access to information and the children's heritage. The minor children are placed together.

13. It is in the best interest of the minor children for termination to be granted as to [Mother and Father] since the parents have not demonstrated such a lasting adjustment of circumstances, conduct or conditions to make it safe and beneficial for the children to be in the home of the parents, there is likely criminal activity in the home or by the parents, and the parents' use of alcohol, controlled substances or controlled substance analogues would render the parents unable to consistently care for the children in a safe and stable manner. [Mother and Father] have not completed a single task on the permanency plans, have been arrested, and abuse illegal substances.

14. It is in the best interest of the minor children for termination to be granted as to [Mother and Father] since the parents have not taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct or conditions. The Department has made available an abundant amount of services for the parents to utilize, yet the parents are still in the same position as the[y] were when the children entered custody in 2018.

15. It is in the best interest of the minor children for termination to be granted as to [Mother and Father] since the Department has made reasonable efforts to assist the parents in making a lasting adjustment.

16. It is in the best interest of the minor children for termination to be granted as to [Mother and Father] since the parents have not demonstrated a sense of urgency in seeking custody of the children or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the children's best interest to return home. The children entered

- 16 -

care in November of 2018, the parents have yet to resolve the issues that brought the children into the care of the Department.

17. It is in the best interest of the minor children for termination to be granted as to [Mother and Father] since the parents have never provided safe and stable care for the children. The children were removed due to the mother's failure to provide safe and stable care for the children and the father has never maintained care for them.

18. It is in the best interest of the minor children for termination to be granted as to [Mother and Father] since the parents have not demonstrated an understanding of the basic and specific needs required for the children to thrive. Neither parent has shown a[n] understanding of what needs the children have to flourish and thrive.

19. It is in the best interest of the minor children for termination to be granted as to [Mother and Father] because the parents have never demonstrated the ability and commitment to creating and maintaining a home that meets the children's basic and specific needs and in which the children can thrive. The mother is involved in an eviction process, resides with a violent criminal, and she lacks the ability to appropriately supervise the children. . . . Further, both parents have substance abuse issues which would impact their ability to have a safe and stable home environment for the children.

20. It is in the best interest of the minor children for termination to be granted as to [Mother and Father] since the physical environment of the parents' home is not healthy and safe for the children. [Mother and Father] have unresolved substance abuse issues and have not completed any services. Further, the mother lives in a home with an individual who pled guilty to shooting her and she has not admitted that he is dangerous.

* * *

Thus the Court finds that the Tennessee Department of Children's Services has proven, by clear and convincing evidence, that grounds for termination of parental rights exists and has proven, by clear and convincing evidence, that it is in the best interest of the children that all of the parental rights of [Mother and Father] to said children be forever terminated; and therefore the complete custody, control, and FULL GUARDIANSHIP of said children be awarded to the State of Tennessee, Department of Children's Services, with the right to place said children for adoption and to consent to said adoption in loco parentis.

- 17 -

Following entry of the Juvenile Court's judgment, Mother timely appealed to this Court.

## Discussion

Although not stated exactly as such, Mother raises the following issues for our review on appeal: (1) whether the Juvenile Court's written judgment terminating Mother's parental rights accurately reflects the Juvenile Court's independent judgment as announced at the conclusion of trial; (2) whether this trial was so replete with errors as to deny Mother the right to a fundamentally fair proceeding; (3) whether the Juvenile Court erred in finding by clear and convincing evidence that Mother abandoned the Children by failing to provide a suitable home; (4) whether the Juvenile Court erred in finding by clear and convincing evidence that Mother was not in substantial compliance with the permanency plans; (5) whether the Juvenile Court actually found by clear and convincing evidence that the conditions which led to the removal of the Children from Mother's home still persisted, and if so, whether such finding was in error; (6) whether the Juvenile Court erred in finding by clear and convincing evidence that Mother failed to manifest an ability and willingness to assume custody of the Children; (7) whether the evidence presented at trial supports a finding by clear and convincing evidence that termination of Mother's parental rights is in the best interest of the Children; and (8) whether the Juvenile Court applied the correct best interest factors in its best interest analysis. Additionally, DCS raises an issue as to whether Mother waived various arguments by failing to preserve her objections at trial, and alternatively, whether Mother is entitled to relief by collaterally attacking the proceedings based on ineffective assistance of counsel.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In combination with a best interest finding, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Additionally, the Trial Court is the arbiter of witness credibility of those who testify live before it. As our Supreme Court has instructed:

When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d

215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ––– U.S. ––––, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014).

We first address Mother's issues concerning whether the Juvenile Court's judgment reflects the independent judgment of the Juvenile Court. The Juvenile Court's judgment was prepared by DCS before it was entered by the Juvenile Court. In its oral ruling at the conclusion of trial, the Juvenile Court did not mention the statutory ground of persistent conditions. However, that ground was found by the Juvenile Court in its written order. Because we cannot conclude that the Juvenile Court's finding of this ground was its independent judgment, we vacate the ground of persistent conditions.

Nevertheless, we disagree with Mother's argument that the remainder of the Juvenile Court's judgment was not its independent judgment. We hold that this case is distinguishable from *In re Marneasha D.*, No. W2017-02240-COA-R3-PT, 2018 WL 4847108 (Tenn. Ct. App. Oct. 4, 2018), *no perm. app. filed*, and *In re Colton B.*, No. M2017-00997-COA-R3-PT, 2017 WL 6550620 (Tenn. Ct. App. Dec. 22, 2017), *no perm. app. filed*, which were cited by Mother in her appellate brief as examples of termination proceedings in support of her argument. In those cases, the trial court had made little or no findings specific to the grounds or best interest determination in its oral ruling before instructing a party to draft a judgment. However, in the present case, the Juvenile Court made several findings of fact during its oral ruling concerning the remaining grounds for termination of Mother's parental rights, as well as the best interest analysis. Although the written judgment is more detailed than the oral ruling, the findings of fact within its written judgment are consistent with those made in its oral ruling. The findings of fact made by the Juvenile Court in its oral ruling were sufficient to support the remaining statutory grounds for termination and the best interest analysis. Therefore, we hold that the Juvenile Court's written judgment concerning the remaining grounds is the independent judgment of the Juvenile Court.

We next address Mother's issue regarding whether the trial in this matter was "so replete with errors" as to deny Mother the right to a fundamentally fair proceeding. According to Mother, she is entitled to "a new trial with new counsel at a minimum." However, DCS raises an issue as to whether Mother waived various arguments in this regard by failing to preserve her objections at trial, and alternatively, whether Mother is entitled to relief by collaterally attacking the proceedings based on ineffective assistance of counsel. Although we agree with DCS that Mother has waived some issues by failing to raise them in the Juvenile Court proceedings, we will address these alleged errors as a whole regarding whether Mother received a fundamentally fair proceeding in this termination action. As our Supreme Court has held, a parent is entitled to a fundamentally fair proceeding when termination of his or her parental rights is being sought. *See In re Carrington H.,* 483 S.W.3d at 522.

Some of the alleged errors of which Mother complains involve actions made by her trial counsel during the termination proceedings. Other alleged errors refer to actions by the Juvenile Court. In arguing that she was deprived of a fundamentally fair proceeding, Mother points to the lack of an opening and closing statement at trial by Mother's counsel and her trial counsel's failure to object to inadmissible evidence. We recognize that these choices by trial counsel may well have been strategic decisions by counsel seeking to best represent Mother's interests. Additionally, none of the attorneys that participated in trial had given an opening or closing statement during trial, and Mother has not demonstrated how the lack of an opening or closing statement or the admission of any such evidence had denied her a fundamentally fair proceeding. Despite this, Mother's counsel represented her during trial by participating in cross-examination of several witness, eliciting testimony that was favorable to Mother. In fact, during trial counsel's questioning of Mother regarding child support and her employment, the Juvenile Court stated that it was not finding the statutory ground of abandonment by failure to support upon its finding that Mother had successfully rebutted the statutory presumption that her failure to support was willful.

Mother further argues that the Juvenile Court read a report that was relevant to the permanency hearing conducted after the termination trial, and such report was not admissible at the termination trial. Mother states that the Juvenile Court referenced the report during Mother's testimony but that its contents are unknown. The Juvenile Court mentions reading an unknown report during trial but does not state its contents. This report neither was entered as an exhibit during the termination trial nor was it referenced in the Juvenile Court's judgment terminating Mother's parental rights. There is no evidence that the Juvenile Court considered this report in making its decision in the termination proceedings.

Additionally, Mother argues that the Juvenile Court used the wrong best interest factors and points out that the final order contained "so much extraneous language" that she was unable to separate the Juvenile Court's findings from language included by DCS.

- 23 -

We have agreed with Mother that there was an insufficient record to demonstrate the Juvenile Court's independent judgment as to the ground of persistent conditions. However, as stated above, the Juvenile Court made sufficient findings of fact and conclusions of law during its oral ruling that are consistent with its written order, such that the remainder of the judgment is the independent judgment of the Juvenile Court.

Mother also takes issue with the fact that the written judgment was not entered by the Juvenile Court within thirty days as statutorily required, which had delayed her appeal. *See* Tenn. Code Ann. § 36-1-113(k) ("The court shall enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing."). The termination trial was conducted on April 29, 2021. The Juvenile Court's written judgment was filed on June 11, 2021, approximately two weeks more than the thirty-day requirement. This Court has previously determined that a trial court's noncompliance with the thirty-day requirement in Tennessee Code Annotated § 36-1-113(k) does not deprive the trial court of subject matter jurisdiction, nor does it require or contemplate this Court vacating a trial court's termination judgment on that basis alone. *See In re Jackson G.*, No. M2013-02577-COA-R3-PT, 2014 WL 3844793, at *4 (Tenn. Ct. App. Aug. 4, 2014), *no perm. app. filed.* Although the trial court should enter its termination orders as expeditiously as possible, failure to enter its order within thirty days as required by Tennessee Code Annotated § 36-1-113(k) does not require this Court to vacate or reverse a trial court's judgment. *See In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *4 (Tenn. Ct. App. Apr. 17, 2019), *no perm. app. filed*; *In re M.R.W.*, No. M2005-02329-COA-R3-PT, 2006 WL 1184010, at *3-4 (Tenn. Ct. App. May 3, 2006), *no perm. app. filed*.

Upon our review of the record, it appears that Mother's counsel actively represented her throughout the proceedings. Mother's counsel cross-examined multiple witnesses, eliciting testimony that was beneficial to Mother's case, and was ultimately successful in obtaining denial of one statutory ground for termination. Based on the foregoing, we hold that Mother was not deprived of a fundamentally fair proceeding.

We next address whether the Juvenile Court erred in finding by clear and convincing evidence that Mother abandoned the Children by failing to provide a suitable home. Tennessee Code Annotated § 36-1-113(g)(1) (2021) provides abandonment as a statutory ground for the termination of a parent's parental rights. Tennessee Code Annotated § 36-1-102(1)(A)(ii) (Supp. 2020) defines abandonment in relevant part as follows:

> (a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

The record reflects that the Children were removed from Mother's custody in November 2018, as reflected in the Juvenile Court records from the dependency and neglect proceedings. DCS had filed a petition with the Juvenile Court alleging the Children were dependent and neglected in the care of Mother. In a subsequent bench order placing the Children in DCS custody, the Juvenile Court found that DCS had made reasonable efforts to prevent removal of the Children from the home. Subsequently, the Juvenile Court found the Children to be dependent and neglected due in part to Mother's "failure to provide appropriate care and supervision as evidenced by the mother leaving them alone in the home."

In her brief, Mother seems to take issue with DCS's choice to go through the permanency plans with Mother, instead of its own representative, and the court's reliance on Mother's testimony of DCS's efforts when it determined her not to be credible. According to Mother, there was no credible evidence supporting the finding by the Juvenile Court that DCS had provided reasonable efforts to assist Mother following the removal of the Children from her custody.

The Juvenile Court found Mother not to be credible "due to her being untruthful during testimony." However, we note that a trial court may find some portions of an individual's testimony credible, while determining other portions to not be credible. Although the Juvenile Court did not distinguish between specific testimony it considered credible and not credible, there were portions of Mother's testimony it considered credible. For example, it is clear upon review of its findings that the Trial Court had not completely

discounted Mother's entire testimony. Based on Mother's testimony, the Juvenile Court found that Mother had successfully rebutted the statutory presumption that her failure to support was willful. To make that finding, the Trial Court had to credit Mother's testimony regarding her financial and employment situation. Similarly, the Trial Court appears to credit Mother's testimony concerning services provided by DCS.

The Juvenile Court found that DCS had provided reasonable efforts to assist Mother from May 1, 2020 through August 31, 2020 by performing random drug screens, including a hair follicle drug screen; offering visitation between Mother and the Children; paying for and scheduling a second alcohol and drug assessment for Mother; and providing parent-child interaction therapy (PCIT). Although Mother argues there is no credible evidence to support this finding, we disagree. There is documentation supporting this finding that was admitted as exhibits during trial. As relevant to this time period, DCS developed a permanency plan in June 2020 that was approved by the Juvenile Court shortly thereafter. Returning the Children to a parent was a goal on the permanency plan. In that plan, Mother was required to complete several action steps, which were aimed toward reunifying Mother with the Children. The Juvenile Court conducted a permanency hearing in June 2020, during which it found that DCS was making reasonable efforts toward completion of the permanency plan goal of returning the Children to the parent by "ensuring that the children are receiving placement and services as recommended and that the parents have access to all treatment and services required on the plan." This order further states that DCS had provided or referred the parent for services, including a mental health assessment, an alcohol and drug assessment, alcohol and drug treatment, administration of drug screens, medical evaluation, providing bus passes or other transportation, and facilitating visitation with the Children.

Although Mother is correct that the evidence was not presented that a hair follicle drug screen was conducted during this time, there is evidence that Mother took and failed a drug screen in May 2020. The method of testing was not clarified in the record. Mother further testified that following the failed drug screen, she subsequently completed a new alcohol and drug assessment that had recommended intensive outpatient treatment. Although not giving credit to Mother's testimony about completing her drug treatment, the Juvenile Court found that Mother had completed some assessments. Additionally, Stasi Friedrich, the DCS family services worker, testified that Mother and the Children had been involved with PCIT since January 2020 through the Center of Excellence. Upon a review of the record on appeal, the evidence presented does not preponderate against the Juvenile Court's finding that DCS provided reasonable efforts to assist Mother during a period of four months, as required by Tennessee Code Annotated § 36-1-102(1)(A)(ii)(c).

Concerning whether Mother had made efforts to provide a suitable home for the Children, the Juvenile Court found that Mother had been dishonest with Knoxville's Community Development Corporation ("KCDC") by stating that the Children had been living with her. She had also engaged in behavior that resulted in her receiving complaints

- 26 -

to the apartment complex. Due to the foregoing, Mother's landlord had initiated eviction proceedings against her that were ongoing at the time of trial. It is undisputed that Mother had attended therapeutic visits with the Children, but the Juvenile Court found that Mother had arrived late for visits and had "failed to appropriately engage with the children during visits." During trial, Mother explained how she had transported the Child, Da'Moni, without a car seat during an unsupervised visit. Mother further acknowledged failing a drug screen in May 2020 for THC. Additionally, the Juvenile Court found that Mother had "lied to DCS about sharing her home with a violent criminal [Ramone L.] who pled guilty to shooting the mother." According to the Juvenile Court, Mother still had not acknowledged that her relationship with Ramone L. was tumultuous.

In making its decision, the Juvenile Court found that Mother had not addressed any of the issues that caused the Children to be placed into foster care and was not currently in a better place to care for the Children than she was in November 2018. Although the Juvenile Court found that Mother had completed some required assessments, she had not followed through with the recommendations from those assessments. According to the Juvenile Court, Mother had continued to engage in violent relationships, was about to be evicted from her second apartment, had been dishonest with DCS and with the Juvenile Court during the court proceedings, continued to have a substance abuse issue, had not actively participated in therapy, and had recently pled guilty to "aggressive criminal activities." The Juvenile Court found that Mother had failed to make even minimal efforts to improve her home and personal circumstances, which had demonstrated a lack of concern for the Children such that it appeared unlikely she would be able to provide a suitable home at an early date. Upon our review of the record, we find and hold, as did the Juvenile Court, that DCS proved that Mother had abandoned the Children by failing to provide them with a suitable home. We, therefore, affirm this ground for the termination of Mother's parental rights.

We next address whether the Juvenile Court erred by finding the ground of substantial noncompliance with the permanency plans against Mother. Concerning substantial noncompliance with the permanency plans, Tennessee Code Annotated § 36-1-113(g)(2) (2021) provides:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

The Juvenile Court found that the permanency plan requirements were reasonably related to the reasons for removal. Throughout the time the Children were in DCS custody, the requirements of the court-approved permanency plans required Mother to (1) complete a mental health assessment and follow all recommendations therefrom; (2) complete an alcohol and drug assessment and follow all recommendations therefrom; (3) provide DCS with documentation to show completion of any recommended services from the

assessments; (4) comply with and pass random drug screens; (5) obtain and maintain an appropriate home; (6) obtain and maintain a legal source of income to adequately support the family and provide proof thereof or provide proof of efforts to obtain income; (7) visit with the Children; (8) refrain from operating a motor vehicle without a driver's license; (9) complete parenting classes; (10) demonstrate learned parenting skills necessary to parent the Children during visits; (11) refrain from leaving the Children alone at home for any period of time; (12) be a law-abiding citizen and refrain from incurring new criminal charges; (13) comply with all court orders; (14) cooperate with DCS and all service providers; (15) sign releases to allow direct contact between DCS and providers; (16) refrain from associating with known drug users; and (17) pay child support.

Mother's primary issue concerning this ground, other than the insufficiency of the judgment, appears to be with the avenue in which DCS sought to establish its case. DCS called Mother as a witness at trial and asked Mother during direct examination what efforts she had made to comply with the steps of the permanency plans. By doing so, Mother argues in her brief that there is a lack of evidence regarding development of the permanency plans and why certain requirements were included in the plans. However, Mother fails to specify why that testimony would be important or to otherwise present an argument as to why the requirements for Mother on the plans were not related to remedying the reasons for foster care. Several court orders were entered into evidence reflecting findings that the requirements in the permanency plans were reasonable and related to the reasons necessitating foster care. The Juvenile Court further made this finding in the termination trial. We agree with Mother that Mother does not carry the burden of proof for establishing compliance with the permanency plans. However, by calling Mother as a witness at trial, DCS was not shifting the burden onto Mother to establish that grounds did not exist, and Mother presents no legal authority to support her argument. Regardless of which witnesses DCS called, it maintained the burden of establishing that statutory grounds existed, as well as whether termination is in the Children's best interest. We find no merit with Mother's argument in this regard.

In her argument concerning substantial noncompliance with the permanency plan, Mother also argues that there was a lack of evidence to support reasonable efforts by DCS to assist Mother. Although we recognize that the Juvenile Court made this finding in its written order, DCS is not required to demonstrate reasonable efforts concerning the statutory ground of substantial noncompliance with the permanency plans. *See In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015) (holding that proof of reasonable efforts is not a precursor to termination of parental rights, is required for abandonment by failure to provide a suitable home, and is a factor in the best interest analysis). We find no merit to this argument by Mother.

The Juvenile Court found that Mother had failed to substantially comply with the reasonable requirements in the permanency plans. Mother has consistently visited the Children and participated in PCIT with the Children. Based on the June 2020 permanency

- 28 -

plan, it appears that Mother had initially complied with a mental health assessment and completed parenting classes. However, the Juvenile Court found that Mother continued to abuse illegal drugs, had not secured stable housing, and had not demonstrated any learned parenting skills. Although the record reflects that Mother paid some child support payments at some point while the Children were in foster care, Mother acknowledged during trial that she had not paid any child support for the Children during the four months prior to the petition's filing.

In its judgment, the Juvenile Court found that Mother had completed some assessments required by the permanency plans but had not provided proof of completion for the recommendations from those assessments. Mother had complied with an alcohol and drug assessment in 2019 but was required to have a second assessment after she failed a drug screen. Mother testified that she had completed the new assessment and the intensive outpatient treatment recommended from that assessment. However, the Juvenile Court found that Mother had continued to abuse drugs and had not provided proof that she completed the recommendations from her assessments, which suggests that the Juvenile Court did not find Mother's testimony in this regard to be credible. Additionally, Mother testified to completing a new mental health assessment and parenting assessment in late 2020, to which Mother did not recall the recommendations from either assessment, nor did she provide proof of completion of any recommendations. Although Mother testified that she had been participating in therapy at Cherokee Health, Ms. Friedrich testified that she contacted Cherokee Health Systems and was informed by the provider that Mother had never been a patient at the facility. The Juvenile Court further found that Mother had not demonstrated any learned parenting skills. In fact, Mark Akers and Walter Ramirez testified that Mother's relationship with the Children was not an appropriate parent-child relationship and each described their concerns with Mother's behaviors during visits.

Additionally, the Juvenile Court found that Mother had continued a relationship with an individual who had pled guilty to shooting her, had been dishonest about the relationship, and was going to be evicted from her home soon, none of which supports that Mother had created a stable home environment for the Children. In fact, the Juvenile Court found that Mother's pending eviction puts her in a place similar to when the Children were removed from her custody. The Juvenile Court found that although services were offered to Mother, she had not participated in those services to resolve the issues necessitating foster care. Although Mother initially had completed some requirements on the permanency plans, we find and hold, as did the Juvenile Court, that DCS proved by clear and convincing evidence that Mother had not substantially complied with the reasonable requirements in the permanency plans. We, therefore, affirm this ground for the termination of Mother's parental rights.

We next address whether the Juvenile Court erred by finding by clear and convincing evidence the ground of failure to manifest an ability and willingness to assume

- 29 -

custody of or financial responsibility for the Children as to Mother. Tennessee Code Annotated § 36-1-113(g)(14) (2021) provides as follows as a ground for termination:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

This ground has two prongs. Regarding the first prong of our analysis, our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (emphasis in original). The second prong of the statute requires the court to consider whether placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *See* Tenn. Code Ann. § 36-1-113(g)(14) (2021).

With regard to the first prong of this ground, the Juvenile Court found that Mother had been living with a man, Ramone L., who had shot her with a 38-caliber handgun and that Mother continued to deny that her relationship with that man was tumultuous. The record reflects that Ramone L. pled guilty to assault against Mother following the incident. According to the Juvenile Court, Mother was not able to safely parent the Children. Mother had not attended therapy in at least six months, continued to abuse illegal substances, and would soon be evicted from her home. Additionally, the Juvenile Court found that Mother had failed to comply with the requirements of the permanency plans and that Mother's actions had demonstrated "a complete lack of interest and concern" as to the Children's welfare. A parent's actions or inaction can be analyzed by the trial court in its determination of whether the parent has established a lack of willingness to assume custody of or financial responsibility for the Child. *See In re Ryan J. H.*, No. M2019-01439-COA-R3-PT, 2020 WL 7861376, at *14 (Tenn. Ct. App. Dec. 22, 2020), *no perm. app. filed*, ("[The parent's] actions in the present case raise doubts as to his actual willingness to assume custody of the Child."); *In re Ellie K.*, No. M2019-01269-COA-R3-PT, 2020 WL 1943522, at *11 (Tenn. Ct. App. Apr. 23, 2020), *no perm. app. filed*, ("It is well established that a parent's actions can demonstrate a lack of willingness to assume custody of or financial responsibility for the child."). We agree with the Juvenile Court that clear and convincing evidence was presented by DCS to establish that Mother had failed to manifest an ability and willingness to assume custody of or financial responsibility for the Children, as required by Tennessee Code Annotated § 36-1-113(g)(14).

By the same quantum of proof, DCS has proven the second prong in establishing that returning the Children to Mother's custody would pose a risk of substantial harm to the Children's physical or psychological welfare. The Juvenile Court found that returning

the Children to Mother's custody would pose a risk of substantial harm to the Children "due to the substantial unresolved issues of domestic violence, substance abuse, inability to safely parent and housing." We agree with the Juvenile Court that returning the Children to Mother's legal or physical custody would create a risk of substantial harm to the Children. Therefore, we affirm the Juvenile Court's finding that DCS has proven this statutory ground for termination of Mother's parental rights by clear and convincing evidence.

Finally, having determined that grounds exist for the termination of Mother's parental rights, we next address her argument concerning the best interest analysis. Mother argues that the Trial Court erred in finding by clear and convincing evidence that termination of her parental rights was in the Children's best interest. As part of her argument, Mother avers that the Juvenile Court utilized the wrong best interest factors in its analysis. Upon review of the record, the Juvenile Court analyzed the new factors in its oral ruling that had not taken effect at the time the termination petition was filed. However, when questioned by DCS counsel, the Juvenile Court stated that "[t]he new best interest factors incorporate all nine of the old best interest factors." As such, the Juvenile Court stated that its findings would be identical and would be consistent with the factors relevant to this case.

The version of Tennessee Code Annotated § 36-1-113(i) (Supp. 2020) that was in effect when the termination petition was filed provides a set of non-exclusive factors courts are to consider in determining whether termination of parental rights is in a child's best interest:

> (i)    In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1)    Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2)    Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3)    Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4)    Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).[6]

---

[6] Although the following best interest factors were not in effect at the time the termination petition was filed, we include these for purposes of comparison with the previous best interest factors that are relevant to this proceeding. The newly enacted best interest factors provide as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
        (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
        (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
        (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
        (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
        (E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
        (F) Whether the child is fearful of living in the parent's home;

Mother argues on appeal that the Juvenile Court utilized the wrong best interest factors, which would require reversal. However, the Juvenile Court concluded that the relevant best interest factors that were in effect prior to April 2021 are included in the newly enacted statutory factors that it had addressed in its oral ruling. We agree with the Juvenile Court that the best interest factors relevant to this case are included in the new version of factors that went into effect in April 2021. For example, factors (1) and (7) in the relevant best interest factors are combined in the new best interest factors in subsection (J), which

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;
(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;
(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;
(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;
(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;
(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;
(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;
(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;
(O) Whether the parent has ever provided safe and stable care for the child or any other child;
(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;
(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;
(R) Whether the physical environment of the parent's home is healthy and safe for the child;
(S) Whether the parent has consistently provided more than token financial support for the child; and
(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(k) (2021).

- 33 -

analyzes whether the parent has made such an adjustment of his or her circumstances to make it safe for the child to return to the parent's home and includes in that consideration the parent's criminal activity and substance abuse. Factor (2) in the relevant best interest factors is similar to subsection (K) because they both involve whether the parent has taken advantage of provided services available to them in an effort to adjust his or her circumstances. Similarly, factors (3) and (4) are included in subsections (D) and (E), which consider the parent's visitation and relationship with the child; factor (5) is virtually identical to subsection (B) and both involve the effect on the child if there is a change in caretaker or physical environment; factor (6) is included within subsection (N), both of which consider whether the parent or other individual in the home has committed brutality, abuse, or neglect toward the child at issue or another child in the home; factor (8) includes the same considerations as subsection (T) given that both consider the parent's mental and emotional fitness to care for the child; and factor (9) is similar to subsection (S) in that they both analyze child support contributions by the parent.

We note that the Juvenile Court recognized that the relevant factors were included in the new factors and included in its written order an analysis of the relevant factors, in addition to several of the new factors. The relevant factors in effect at the time the termination petition was filed allow for the trial court to consider other relevant factors outside the statutorily enumerated factors. *See* Tenn. Code Ann. § 36-1-113(i) (Supp. 2020) (includes "a set of non-exclusive factors" for courts to consider). Although the Juvenile Court initially considered the incorrect statute in its oral ruling, its analysis in the written judgment included consideration of the correct best interest factors after it was brought to the court's attention at the conclusion of trial, in addition to some of the new best interest factors that were enacted prior to trial. Based on the foregoing, we hold that the Juvenile Court properly considered the correct best interest factors in its analysis and hold that there is no reversible error with the Juvenile Court's best interest analysis.

Although Mother has not included an argument concerning the facts pertaining to the best interest analysis, we will nonetheless address whether the Juvenile Court erred by finding by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest. With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H*., 483 S.W.3d at 523 (citing *In re Audrey S*., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S*., 455 S.W.3d at 555 (citing *In re Audrey S*., 182 S.W.3d at 861). "After making

- 34 -

the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In making its decision, the Juvenile Court considered the relevant statutory best interest factors that were in effect when the petition was filed, as well as some of the new factors that had recently been enacted. The Juvenile Court found that Mother had not put the needs of the Children above her own and had not made an adjustment to her conduct and circumstances to demonstrate a lasting change, despite reasonable efforts by DCS to assist Mother. The Juvenile Court found that Mother had not completed the steps on her permanency plans or resolved the issues that caused the Children to be placed into foster care, such that it would be safe for the Children to return to her care. Although Mother

testified that she had completed the recommendations from her second alcohol and drug assessment, the Juvenile Court found Mother's testimony not to be credible and found that she had not complied with the permanency plans. Around the time of trial, Mother had told DCS that she had been attending mental health therapy; however, the provider with whom Mother claimed to be participating had no record of her ever attending treatment at its facility. The Juvenile Court further found that Mother was about to be evicted from her home, was living with a dangerous criminal, and abused illegal drugs. The Juvenile Court found that Mother was in the same position she was when the Children entered foster care. Due to the time Mother has been given to remedy her situation and has failed to do so, the Juvenile Court found that a lasting adjustment by Mother did not appear possible.

Mother had visited with the Children, participating in PCIT with the Children for over a year. Although the Juvenile Court acknowledged some form of relationship between Mother and the Children, it found that Mother did not have a meaningful parent-child relationship with the Children due to her inability to parent the Children in an appropriate manner and her "lack of regard concerning her parenting skills." The Juvenile Court found that Mother and the Children did not have "a healthy parental attachment," which is supported by Mr. Ramirez's testimony that he had concerns with Mother's behavior during visits with the Children and the testimony of Mr. Akers that Mother was more of a peer to the Children than a parent and that he would have concerns with the Children's safety and supervision if they were placed in Mother's custody. Despite the Children being in foster care for approximately two-and-a-half years, the Juvenile Court found that Mother had still failed to demonstrate "an ability to safely provide for the care and supervision" of the Children.

In contrast, the Children were bonded with their foster parents, with whom they had resided for approximately two years. During that time, the foster parents had provided them with a loving home, cared for them, and ensured their needs were met. The Juvenile Court found that the foster parents wish to adopt the Children and could give them "stability and continuity." The Juvenile Court found that changing the Children's caretaker or physical environment would have an "extreme negative effect" on them. In its oral ruling, the Juvenile Court found that changing the Children's current physical environment would be "devastating" to their emotional and psychological conditions.

The record does not preponderate against any of these findings of fact by the Juvenile Court. We find and hold by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest.

## Conclusion

The judgment of the Trial Court terminating the parental rights of Atiya L. is affirmed as modified, and this cause is remanded to the Trial Court for collection of the costs assessed below.  The costs on appeal are assessed against the appellant, Atiya L., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE